NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO D.T.

No. 1 CA-JV 23-0192
FILED 4-25-2024

---

Appeal from the Superior Court in Maricopa County
No. JD533384
The Honorable Jay M. Polk, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Public Advocate, Mesa
By Suzanne Sanchez
*Counsel for Appellant*

Arizona Attorney General's Office, Tucson
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge James B. Morse Jr. delivered the decision of the Court, in which Presiding Judge Angela K. Paton and Judge Michael S. Catlett joined.

---

**M O R S E**, Judge:

¶1 Alvin T. ("Father") appeals the juvenile court's denial of his motion to set aside its order terminating his parental rights and his consent to adoption. For the following reasons, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

¶2 Father and D.G. ("Mother") are the biological parents of D.T. ("Child"), who was born prematurely in January 2020. Mother passed away during childbirth.

¶3 In February 2020, the hospital discharged Child, and Father took Child home. One month later, Child returned to the hospital due to breathing issues. The hospital discharged Child in April 2020 with a gastrointestinal tube ("G-Tube") and trained Father on how to feed Child with the G-Tube. Shortly after Child's discharge from the hospital, Child began receiving in-home healthcare services to monitor his progress. By May 2020, Child's doctor determined Child was "fail[ing] to thrive" and admitted Child to the hospital.

¶4 A few days later, the Department of Child Safety ("DCS") placed Child into temporary physical custody and filed a dependency petition alleging Father was unable to provide Child with proper and effective parental care and control. At the initial hearing, the court ordered Child to remain in out-of-home care but approved a parenting time schedule for Father to visit Child and set the case plan for family reunification. In September 2020, Father pled no contest to the allegations, and the court adjudicated Child dependent and approved the family-reunification case plan.

¶5 During the dependency, Father participated in two psychological evaluations. After the first evaluation, the doctor ruled out a diagnosis of bipolar disorder but noted that Father had a reading level below second grade and displayed some "cognitive deficits." The doctor, however, concluded that Father was able to adapt, learn, and retain information. After the second evaluation, the doctor diagnosed Father with intellectual developmental disorder and noted that Father continued to lack "insight and awareness associated with his ability to meet his own needs as well as his child's medical and developmental needs." The doctor concluded that it was "highly unlikely" that Father would be able to "demonstrate the ability to retain and maintain the skills" to "minimally parent" Child "within the foreseeable future, even with intensive services."

¶6            In December 2021, two days before the second psychological evaluation, Father moved to place Child in his physical custody.  Father noted that (1) Child no longer needs the G-Tube, physical therapy, or the same level of care as he did before and has no cognitive delays; (2) he has participated in all the services that DCS has offered him and demonstrated that he can care for Child; (3) he has had unsupervised visits with Child since September without incident; (4) he attends Child's medical appointments when permitted and understands the importance of keeping up with appointments; (5) he has stable housing and income; and (6) he has identified appropriate support to cope with the loss of Mother.  In response, DCS acknowledged Father's participation in services and awareness of Child's medical needs, but argued that returning Child immediately would pose a substantial risk of harm to Child and a transition into Father's home "over a period of time will be better for everyone."  The court set a hearing for January 2022.  At the hearing, Father withdrew his motion for change in physical custody, and the court granted his request.

¶7            In March 2022, Father again moved to place Child in his physical custody.  Father renewed his previous arguments and also noted (1) a few issues with Child's placement regarding Child's medical appointments and medication; (2) an unannounced home visit from DCS; and (3) DCS had failed to disclose reports from a parenting program Father had participated in for over six months.  Father indicated he wanted the reports to renew his motion for a change in physical custody.  The court set a hearing for April 2022.  At the hearing, the court heard testimony from the parenting program caseworker, Father, Child's placement, a DCS caseworker, and Father's significant other.  The court took the matter under advisement and set a review hearing for June 2022.

¶8            In May 2022, the court denied Father's motion for change in physical custody, concluding Father failed to show, by a preponderance of the evidence, that there is no substantial risk of harm to Child's physical, mental, and emotional health if returned to his care.  The court noted Child "has special needs and requires specialized care" for his medical conditions and "Father has serious cognitive delays" and is not able to manage Child's care without the assistance of others.

¶9            At the June 2022 review hearing, the court changed the case plan to termination and adoption and ordered DCS to file a termination motion by June 21.  Father objected to the change in case plan, and the court set the initial termination hearing for August 2022.  DCS then moved to terminate Father's parental rights under the mental-deficiency and fifteen-

months time-in-care grounds. The court eventually set a pretrial conference for August 2023.

**¶10** At the August 2023 pretrial hearing, Father advised the court that he wanted to discuss the "possibility of termination by consent and a Post Adoption Contact Agreement." The court then ordered the parties to participate in mediation on August 8 to discuss the matter. At mediation, the parties agreed that DCS would request to amend the grounds for termination from mental deficiency and fifteen-months time-in-care to "Father's signed consent." Father also consented to place Child for adoption.

**¶11** Following mediation, the court granted DCS "leave to file an amended [termination] motion to strike all the allegations and proceed on Consent only," and set a termination hearing for August 15. At the termination hearing, the court indicated it would grant DCS's amended motion to terminate Father's parental rights but requested that DCS submit proposed findings of fact and conclusions of law before it would issue a "formal ruling on the severance issue."

**¶12** On August 24, DCS disclosed to Father records from a home-healthcare-services company that had provided in-home care to Child from April 2020 to June 2020. On September 29, the court issued the formal appealable order terminating Father's parental rights as to Child.

**¶13** On October 16, Father moved to set aside his consent to adoption and the court's termination order under Arizona Rule of Procedure for the Juvenile Court ("Rule") 318(c). Father argued that DCS's untimely disclosures of reports regarding Child's home healthcare services constituted "newly discovered evidence" and "other misconduct" under Arizona Rule of Civil Procedure ("Civil Rule") 60(b)(2) and (3). Father claimed the home healthcare reports contain evidence that "tends to establish that he is able to meet [Child's] special needs" and "he would not have signed the consent form if he had timely received the [home healthcare] records." DCS opposed Father's motion.

**¶14** The court denied Father's motion to set aside its order terminating his parental rights and Father's consent for adoption, concluding the late disclosures would not have changed the outcome of the case and "DCS did not engage in any misconduct with respect" to the late disclosures.

**¶15** Father timely appealed, and we have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

**¶16**        On appeal, Father only challenges the court's denial of his motion to set aside his consent to adoption and the termination order. We review the denial of a motion to set aside a final order for an abuse of discretion. *Trisha A. v. Dep't of Child Safety*, 247 Ariz. 84, 91, ¶ 27 (2019).

**¶17**        Rule 318(c) requires motions to set aside a final order entered in juvenile cases to conform to the requirements of Civil Rule 60(b) through (d). Civil Rule 60(b) sets forth six grounds to set aside a final order. Ariz. R. Civ. P. 60(b)(1)–(6). Father relied on two grounds: (1) "newly discovered evidence" and (2) "other misconduct of an opposing party." Ariz. R. Civ. P. 60(b)(2)–(3). As part of his "other misconduct" claim, Father argued DCS violated the disclosure requirements under Rule 315 and cited *Breitbart-Napp v. Napp*, 216 Ariz. 74, 82, ¶ 28 (App. 2007), to argue "a discovery disclosure violation may qualify as 'other misconduct.'"

**¶18**        But Father now argues that DCS's untimely disclosure is subject to sanctions under Rule 315(g) in the form of a motion to set aside and that he was prejudiced by the late disclosure.

**¶19**        Under Rule 315(c), parties have an ongoing obligation to disclose any relevant documents "no later than 10 days after its receipt or preparation," or if received or prepared less than 10 days before a hearing, "the party must disclose it as soon as practicable before the hearing." Either on a party's motion or on its own, "the court may impose sanctions on a party who fails to disclose information in a timely manner." Ariz. R.P. Juv. Ct. 315(g). "Sanctions may include granting a continuance, precluding evidence, or entering any order the court deems appropriate." *Id.* DCS concedes that its disclosures were untimely.

**¶20**        Rule 315(g) allows but does not require a court to impose sanctions for untimely disclosures. *See* Ariz. R.P. Juv. Ct. 315(g) (providing that a court "may" impose sanctions for an untimely disclosure); *see also B & R Materials, Inc. v. U.S. Fid. & Guar. Co.*, 132 Ariz. 122, 124 (App. 1982) (imposing sanctions on a party for refusing to make discovery "is a matter within the discretion of the trial court"). Here, the court considered the grounds argued by Father under Civil Rule 60(b)(2) and (3), but concluded he failed to show that the untimely disclosures would have changed the outcome of the case or constituted misconduct. Thus, because the court's decision to not impose sanctions is discretionary and Father failed to make the requisite showing under Civil Rule 60(b)(2) and (3) — and does not reassert his Civil Rule 60(b) arguments on appeal — the court did not abuse

its discretion by denying Father's motion to set aside Father's consent to adoption or its termination order.

**¶21** As to prejudice, Father argues that the untimely disclosed reports "reflected favorably upon [his] ability to meet [Child's] special medical needs." But the late-disclosed records relate to before, or at the very beginning of, DCS's involvement. Father fails to show that he was prejudiced by the untimely disclosure in light of all the records produced covering the three years of DCS involvement. And Father was not prejudiced when the court concluded that Father had not shown that the "two-months of records from more than three years prior to [Father] signing the Adoption Consent would have changed the outcome in this case" or that DCS intentionally submitted the home healthcare reports late. Because Father argued that the untimely disclosed reports constituted newly discovered evidence, the court noted Father had over three years to discover the home healthcare reports and those reports included observations of Father's care of Child—"facts of which [Father] would, or should, have been aware [of] at the time the observations were occurring in 2020." The court further noted that Father could have sought discovery of the home healthcare reports "rather than waiting for DCS to do so" as the reports of Father's care for Child were from before DCS's involvement with Child and Father. Father has not shown that the court abused its discretion or that he was prejudiced by the untimely disclosure.

**¶22** Father also argues that DCS's untimely disclosure unduly influenced him to consent to adoption and "offends due process and thus is subject to sanctions." But Father did not raise these issues before the juvenile court. Our ability to consider issues, including constitutional issues, raised for the first time on appeal is discretionary. *Aleise H. v. Dep't of Child Safety*, 245 Ariz. 569, 573, ¶¶ 12–13 (App. 2018); *see Marquette Venture Partners II, L.P. v. Leonesio*, 227 Ariz. 179, 185, ¶¶ 24–25 (App. 2011) (due process). In exercising our discretion, we decline to address Father's undue influence and due process claims on appeal.

## CONCLUSION

**¶23** We affirm.

